# United States Court of Appeals for the Federal Circuit

2007-1201, -1239

SYMANTEC CORPORATION,

> Plaintiff/Counterclaim Defendant-
> Appellant,

and

HILGRAEVE, INCORPORATED,

> Plaintiff/Counterclaim Defendant,

v.

COMPUTER ASSOCIATES INTERNATIONAL, INC.,

> Defendant/Counterclaimant-
> Cross Appellant,

and

RICHARD B. LEVIN,

> Counterclaimant-Cross Appellant.

David A. Nelson, Latham & Watkins LLP, of Chicago, Illinois, argued for plaintiff/counterclaim defendant-appellant. With him on the brief was Mark A. Flagel, of Los Angeles, California. On the brief were Daniel A. Boehnen, George I. Lee, and Jeffrey A. Steck, McDonnell Boehnen Hulbert & Berghoff LLP, of Chicago, Illinois. Of counsel on the brief was Joseph Fitzgerald, Symantec Corp., of Cupertino, California.

Michael A. Nicodema, Greenberg Traurig LLP, of New York, New York, argued for defendant/counterclaimant-cross appellant. With him on the brief was Gaston Kroub.

Gerry J. Elman, Elman Technology Law, P.C, of Swarthmore, Pennsylvania, for counterclaimant-cross-appellant.

Appealed from: United States District Court for the Eastern District of Michigan

Chief Judge Bernard A. Friedman

# United States Court of Appeals for the Federal Circuit

2007-1201, -1239

SYMANTEC CORPORATION,

Plaintiff/Counterclaim
Defendant-Appellant,

and

HILGRAEVE, INCORPORATED,

Plaintiff/Counterclaim Defendant,

v.

COMPUTER ASSOCIATES INTERNATIONAL, INC.,

Defendant/Counterclaimant-
Cross Appellant,

and

RICHARD B. LEVIN,

Counterclaimant-Cross Appellant.

Appeals from the United States District Court for the Eastern District of Michigan in case no. 02-CV-73740, Chief Judge Bernard A. Friedman.

_____

DECIDED: April 11, 2008

_____

Before GAJARSA, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

In this patent infringement suit, appellant Symantec Corporation ("Symantec")

appeals from the district court's grant of summary judgment of non-infringement of

claims 1-20 of the asserted patent, U.S. Patent No. 5,319,776 ("the '776 patent"). Symantec Corp. v. Computer Assocs. Int'l, Inc., No. 02-CV-73740-DT (E.D. Mich. Aug. 31, 2006) (reports and recommendations of magistrate judge).[1] Computer Associates International, Inc. ("CA"), the accused infringer, cross-appeals from the district court's grant of summary judgment on: (1) the defense of laches; (2) inequitable conduct; (3) invalidity over the prior art; and (4) inventorship. Id. Richard B. Levin ("Levin") cross-appeals from the district court's grant of summary judgment that he was not a co-inventor of the '776 patent. Id.

Because we find that the district court erred in its construction of the claim terms "a method of screening data as it is being transferred," "destination storage medium," "computer," and "computer system," we vacate and remand as to non-infringement and invalidity. We dismiss CA's cross-appeal as to laches as improper, but we treat laches as an alternative ground for affirming the judgment. We affirm the district court's decision on laches, inequitable conduct, and inventorship.

BACKGROUND

The '776 patent is here for the third time. The patent is directed to the "In Transit Detection of Computer Virus with Safeguard," and is described in detail in our earlier opinions. See Hilgraeve Corp. v. McAfee Assocs., Inc., 224 F.3d 1349, 1350-52 (Fed. Cir. 2000) ("Hilgraeve I"); Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1338-41

_____

[1] The citations are to the reports and recommendations of the magistrate judge. The district court adopted these reports and recommendations in their entirety by order. Symantec, No. 02-CV-73740-DT (E.D. Mich. Jan. 23, 2007) (order accepting and adopting magistrate judge's reports and recommendations).

(Fed. Cir. 2001) ("Hilgraeve II"). Briefly, the '776 patent discloses a method of scanning for and detecting computer viruses embedded in data files that are downloaded or copied from a remote server (e.g., via the internet) onto a computer. Critically, the claimed virus-scan operates before the downloaded or copied data files are accessible to the computer's operating system, thereby allowing the software to block access to those files early enough to prevent the embedded viruses from spreading and infecting the computer. The '776 patent includes claims 1-20, of which claim 1 and claim 18 are independent. Claim 1 is representative:

> 1. In a system for transferring digital data for storage in a computer storage medium, a method of screening the data <u>as it is being transferred</u> and automatically inhibiting the storage of screened data containing at least one predefined sequence, comprising the steps of:
>
> causing a quantity of digital data resident on a source storage medium to be transferred to a <u>computer system</u> having a <u>destination storage medium</u>;
>
> receiving and screening the transferred digital data <u>prior to storage</u> on the destination storage medium to determine if at least one of a plurality of predefined sequences are present in the digital data received; and
>
> in response to said screening step:
>
> > (a) automatically causing the screened digital data to be stored on said destination storage medium if none of the plurality of predefined sequences are present, and
> >
> > (b) automatically inhibiting the screened digital data from being stored on said destination storage medium if at least one predefined sequence is resent.

'776 patent, col.17 ll.9-29 (emphases added).

In the '776 patent's two prior appearances before this court, the central issue was whether the accused virus-scanning products scanned incoming data files <u>prior to storage</u>. In <u>Hilgraeve I</u>, Hilgraeve, the original assignee of the '776 patent, brought a

patent infringement suit against McAfee Associates ("McAfee") for its VirusScan product. 224 F.3d at 1350. The district court granted summary judgment of non-infringement to McAfee, and Hilgraeve appealed. Id. In that appeal, the parties did not dispute the construction of the claim term "storage," which the district court had construed as occurring "when the incoming digital data is sufficiently present on the destination storage medium, and accessible by the operating system or other programs, so that any viruses contained in the data can spread and infect the computer system." Id. at 1351.

In Hilgraeve II, Hilgraeve asserted the same '776 patent in a separately filed action against Symantec. 265 F.3d at 1338. The district court granted summary judgment of non-infringement to Symantec, and Hilgraeve appealed. Id. On appeal, Hilgraeve challenged the district court's construction of the term "storage," which differed from the construction in Hilgraeve I because it did not include the "accessible by the operating system or other programs" language. Id. at 1341. Symantec argued that the term should be construed to occur "when the data become physically present (i.e., magnetically recorded) on the storage medium." Id. We rejected Symantec's construction and adopted Hilgraeve's construction (which was identical to the district court's construction in Hilgraeve I) of "storage," holding that "storage" occurred "when the incoming digital data [are] sufficiently present on the destination storage medium and accessible by the operating system or other programs so that any viruses contained in the data can spread and infect the computer system." Id. at 1342.

Subsequent to our decision in Hilgraeve II, Symantec settled its dispute with Hilgraeve, and, as part of that settlement, purchased Hilgraeve's interest in the '776

patent.  Hilgraeve had previously filed a new infringement action against CA, alleging infringement of claims 1-20 of the '776 patent.  The district court then substituted Symantec as the plaintiff.

CA, the accused infringer here, develops and sells a number of antivirus software products.  The accused products are: (1) the eTrust EZ and eTrust products (collectively "the EAV products"), which employ both an incoming and outgoing scan mode; (2) the ARCserve product, which is designed to restore data from a backup media where the data had previously been archived; and (3) the Gateway products, which operate as a proxy between a user's personal computer and an unattended gateway computer.

CA's initial pleadings denied infringement and asserted affirmative defenses and counterclaims for invalidity and non-infringement.  Subsequently, CA amended its pleadings to add affirmative defenses (including a defense of laches) and counterclaims for unenforceability of the '776 patent due to inequitable conduct, and for invalidity of the '776 patent under 35 U.S.C. § 256 for failing to name alleged co-inventor Levin.  The district court also granted Levin's motion to intervene as a party and assert a claim for co-inventorship of the '776 patent.

As discussed below, the district court construed the terms "a method of screening the data as it is being transferred," "computer system," and "destination storage medium"—the critical claim terms on appeal—in an order dated March 16, 2005.  Based on its constructions of those terms, it granted summary judgment to CA of non-infringement on the EAV products and the ARCserve product.  Although it did not grant summary judgment on the Gateway products, the parties stipulated to non-infringement of the Gateway products under the district court's claim construction.  The

district court also granted summary judgment to Symantec on invalidity, holding that the '776 patent was not anticipated or obvious in view of several prior art references. Finally, in separate orders, the district court granted summary judgment to Symantec on: CA's affirmative defense of laches; CA's claim that the '776 patent was unenforceable based on inequitable conduct; and CA and Levin's claim that Levin was a joint inventor of the '776 patent. Symantec timely appealed; CA and Levin timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1), except as to CA's improper cross-appeal on the issue of laches.

## DISCUSSION

We review summary judgment decisions without deference, reapplying the standard used by the district court. Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1378 (Fed. Cir. 2008). "Under that standard, summary judgment must be granted when, drawing all reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact and no reasonable jury could return a verdict for the non-movant." Id.

I

A

Symantec's primary challenge is to the district court's determination that the term "a method of screening the data as it is being transferred," appearing in the preambles to the claims, was a claim limitation, and its construction of that phrase to mean "a method of screening the data while it is being moved or copied and before the data is stored to the computer storage medium." J.A. at 15. These determinations bear

directly on the infringement analysis of each of the accused CA products. The dispute centers on whether the claims cover methods that do not screen data until after that data is written to a storage medium but do conduct screening "prior to storage," i.e., before the data is accessible to the operating system or to other computer programs.

Under the district court's construction, antivirus programs that screen data at any time after that data is written to the storage medium (e.g., the computer's hard drive), but before it becomes accessible to the operating system or to other computer programs, fall outside the scope of the "as it is being transferred" limitation, even if screening is completed entirely before the data becomes accessible. This construction, Symantec argues, is in direct conflict with our earlier decision in Hilgraeve II, where we construed the term "storage" to occur "when the incoming digital data is sufficiently present on the destination storage medium and accessible by the operating system or other programs so that any viruses contained in the data can spread and infect the computer system." 265 F.3d at 1342. That construction of the term "storage," Symantec argues, would have no meaning if the claim term "a method of screening data as it is being transferred" were construed to mean that the virus scanning must occur entirely before any data is written to the storage medium.

On appeal, CA does not dispute the binding effect of our earlier construction of the term "storage" in Hilgraeve II. Instead, CA contends that our earlier panel decision did not address the claim term "a method of screening data as it is being transferred," appearing in the preamble, now at issue. That term, it argues, is a separate claim limitation that was added independently to overcome prior art virus-detection methods.

Claim construction is a question of law that we review without deference. <u>Cybor Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

Because the disputed term appears in the preamble to claim 1, we must first determine whether it is in fact a separate limitation. In general, a preamble is construed as a limitation "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." <u>Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting <u>Pitney Bowes, Inc. v. Hewlett-Packard Co.</u>, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). A preamble is not limiting, however, "'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" <u>Id.</u> (quoting <u>Rowe v. Dror</u>, 112 F.3d 473, 478 (Fed. Cir. 1997)). In <u>Catalina</u>, we identified several guideposts to aid in determining whether a preamble should be given limiting weight. For example, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." <u>Id.</u> Absent clear reliance on the preamble in the prosecution history, or in situations where it is necessary to provide antecedent basis for the body of the claim, the preamble "generally is not limiting." <u>Id.</u> at 809. Thus, in general, the purpose of a claim preamble is to give context for what is being described in the body of the claim; if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation.

Here, the only basis for the district court's departure from the general rule was the notion that the "as it is being transferred" language was added separately from the "prior to storage" limitation to overcome the prior art. However, the district court erred in its description of the prosecution history. The prosecution history is clear that both terms were added concurrently to overcome the same prior art. The "as it is being transferred" language did not have its own independent significance. The prosecution history fails to demonstrate "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." See id. at 808.[2]

CA argues alternatively that the district court's construction was nonetheless correct because the "as it is being transferred" term and the "prior to storage" term cannot have the same meaning—they must each be given a distinct construction. Although CA is correct that when construing terms in the body of a claim, the general assumption is that different terms have different meanings, Applied Medical Resources Corp. v. United States Surgical Corp., 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006), the same generally is not true for terms in the preamble. The use of different language in the preamble than in the body of the claims does not suggest that the preamble imposes a limitation. Rather it is assumed that the preamble language is duplicative of the language found in the body of the claims or merely provides context for the claims,

---

[2] CA also argues that the "prior to storage" requirement was already in the claim before amendment because the claim referred to "inhibiting the digital data of said transmission from being stored on said destination storage medium if at least one predefined sequence is present." J.A. at 7439. Even if the original claim language could be construed to include the "prior to storage" limitation, the applicant chose not to rely on that language, and added additional specific "prior to storage" language to overcome the prior art. Under these circumstances, we must assume that the additional language had significance in distinguishing the prior art.

absent any indication to the contrary in the claims, the specification or the prosecution history. Here, there is nothing in the claims, the specification or the prosecution history that suggests that the preamble language "as it is being transferred" has any different meaning than "prior to storage."[3]

Indeed, if the term "as it is being transferred" is to be read consistently with our prior construction of the term "storage," the claim term "as it is being transferred" can only mean that virus scanning occurs "prior to storage."[4] Any other construction of that term would vitiate the meaning that we previously gave to the term "storage" in Hilgraeve I and Hilgraeve II. See Kimberly-Clark Corp. v. Fort Howard Paper Co., 772 F.2d 860, 863 (Fed. Cir. 1985) ("[S]tatements in opinions of this court must be read harmoniously with prior precedent, not in isolation."). There would simply be no reason to construe "storage" to mean that scanning can occur after it is written to the computer but before it is accessible to other programs if the term "as it is being transferred" requires scanning to occur completely before any data is written to the computer.

We conclude that the term "as it is being transferred" simply means "prior to storage." Given our previous construction of the term "storage" in Hilgraeve II, the term "as it is being transferred" must mean "before the incoming digital data is sufficiently

---

[3] CA relies on expert testimony that the preamble and the body of the claim should be interpreted as requiring separate limitations. That testimony does not, however, identify an accepted meaning in the field. To the extent that the testimony merely gives the expert's opinion as to claim construction, we attribute it no weight. See Sinorgchem Co., Shandong v. Int'l Trade Comm'n, 511 F.3d 1132, 1137 n.3 (Fed. Cir. 2007).

[4] This appears to have been our assumption in Hilgraeve I, where we stated: "The claimed invention scans a body of data during its transfer, i.e., before storage of the data with potential viruses on the destination storage medium." 224 F.3d at 1350.

present on the destination storage medium and accessible by the operating system or other programs so that any viruses contained in the data can spread and infect the computer system."[5]  Under these circumstances, the language in the preamble does not impose a separate claim limitation.

B

Symantec also challenges the district court's construction of the terms "computer" and "computer system."  The district court construed these terms to mean a "personal computer or workstation."  In doing so, the district court rejected Symantec's proposed construction that "computer system" meant "any combination of hardware, software, documentation, and manual procedures that are combined to perform a specific function."  J.A. at 16.  Based on the district court's claim construction, the parties stipulated that the Gateway products do not infringe the asserted claims.

The dispute here centers on whether the term "computer system" is properly limited to a single computer, or whether it covers a network of multiple computers.  The district court explained that its construction limited the term "computer system" to a single personal computer or workstation.  The district court premised its construction on the preferred embodiment's use of a single computer, which as the court noted, "constitutes the complete description of the computer system."  The district court also relied on expert testimony that the term "computer system," as used in the specification, referred to a single computer.

---

[5]  Although implicit in the requirement that the screening is performed on "incoming digital data," we note that the claims do not cover methods of screening data for viruses before that data has left the source storage medium.

On appeal, Symantec contends that the district court improperly limited the claims to cover only the preferred embodiment. The specification does not limit the invention to the preferred embodiment, and the ordinary meaning of the term "computer system," according to Symantec, includes both a single computer and a system of multiple, interconnected computers.

We agree with Symantec that the district court's construction of the terms "computer" and "computer system" unduly limits the scope of the claims to a single personal computer. The claims "must be read in view of the specification, of which they are a part." Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). In Phillips, we characterized the specification as "the single best guide to the meaning of a disputed term." Id. We find nothing in the specification that would limit the meaning of the term "computer" or "computer system" to a single computer. The terms are not expressly defined in the specification, and there is nothing in the specification that suggests that it adopted a special definition of those terms.[6] Moreover, the expert testimony that the district court cites does not support the district court's construction. That testimony simply recites how each expert would construe the term "computer system" based on his own reading of the specification. Such expert testimony, which does not identify the "accepted meaning in the field" to one skilled in the art, is unhelpful. Sinorgchem, 511 F.3d at 1137 n.3 (according little or no weight to expert testimony about the meaning of specification terms where the expert failed to present

---

[6] Although the preferred embodiment utilizes a single computer, this is not a case where the specification consistently refers to the invention as involving a single computer. See Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1313 (Fed. Cir. 2007).

evidence of the generally accepted meaning of those terms to persons of ordinary skill in the art).

Because the specification does not reveal any special definition for the terms "computer" or "computer system," we must construe those terms according to their ordinary meaning. In Phillips, we explained that "the words of a claim 'are generally given their ordinary and customary meaning.'" 415 F.3d at 1312. We clarified that the relevant meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1313. Dictionaries are "among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." Id. at 1318. Here, it is clear that the ordinary meaning of the terms "computer" or "computer system" as understood by a person of ordinary skill in the art at the time of the invention is not limited to a single computer or workstation. The Dictionary of Computing at that time defined the term "system," in relevant part, as:

> Anything we choose to regard (a) as an entity and (b) as comprising a set of related components. In computing the word is widely used with many shades of meaning. Most commonly, however, it may refer to a related set of hardware units, or programs, or both. The hardware contents of a computer room may be spoken of as "the system," and so may a range of manufacturer's equipment[.]

Dictionary of Computing 375 (2d ed. 1986). By contrast, the same dictionary defined the term "stand-alone" as "[d]enoting a computer system or subsystem that is capable of operation without being connected to any other computer system or subsystem." Id. at 360. In other words, a stand alone computer is only one type of computer or computer system. We therefore conclude that the ordinary meaning of the terms "computer" and "computer system" to one of ordinary skill in the art in 1990 was not limited to a single,

stand-alone computer or workstation and that the district court erred by unduly limiting its construction of those terms.

Because we find that the terms "computer" and "computer system" are not limited to a single computer, we must vacate and remand to the district court on the issue of infringement of CA's Gateway products. Given our construction of these terms, on remand, the district court should determine whether the combination of computers used in the Gateway system performs all the claimed method steps.

C

Symantec also contends that the district court erred in construing the term "destination storage medium" to mean "a computer storage medium that is the target of the transfer of data as a result of the causing step." This construction, when read together with the district court's construction of the terms "computer" and "computer system," which we rejected above, effectively limited the term "destination storage medium" to encompass only a storage system residing within a stand-alone computer, such as a computer's hard drive. Such a limitation had the effect of excluding from the claim's scope any peripheral devices, such as floppy drives or thumb drives.

The district court reasoned that construing "destination storage medium" to include peripheral devices would be inconsistent with its construction of the term "computer system," since such a construction would "permit the invention to operate outside of the computer system." J.A. at 18. Under the correct construction of "computer system," there is no reason that "destination storage medium" must be limited to a computer hard drive. Under our construction of "destination storage medium," peripheral devices, such as floppy drives and thumb drives, are properly

within the scope of that term. In addition, we note that the inclusion of peripheral devices within the scope of the term "destination storage medium" is consistent with the broad construction we gave that term in Hilgraeve II: "'storage medium' refers to any storage medium of the computer system, if the data, when stored on the medium, are accessible to the operating system or other programs, such that viruses in the data can spread and infect the computer system." 265 F.3d at 1342 n.1.

II

Next, Symantec argues that the district court improperly granted summary judgment of non-infringement on the EAV products based on a finding that CA does not induce infringement of the '776 patent. The district court held that the EAV products failed to meet both the "as it is being transferred" claim limitation and the "causing a quantity of digital data resident on a source storage medium to be transferred" claim limitation. As we have already found that the former was based on an erroneous claim construction, we now need only address the latter claim limitation.

Before the district court, there was no dispute that the EAV products do not "cause[] a quantity of digital data resident on a source storage medium to be transferred," as required by claim 1. Instead, as the district court found, the EAV products work in conjunction with a downloading or copying program, such as an internet browser. The EAV products perform the anti-virus scanning; the downloading program performs the downloading. Symantec argued that CA induces its customers to infringe the '776 patent by promoting its EAV products to be used in an infringing manner in conjunction with a downloading program. The district court rejected this

argument. It held that Symantec could not establish active inducement because it did not show that any third party directly infringed the '776 patent using the EAV products.

35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement," and "second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1378 (Fed. Cir. 2005) (quoting Minn. Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)). We recently clarified en banc that the specific intent necessary to induce infringement "requires more than just intent to cause the acts that produce direct infringement. . . . [T]he inducer must have an affirmative intent to cause direct infringement." DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1306 (Fed. Cir. 2006) relevant section (en banc). Thus, "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." Id.

On appeal, Symantec asserts that it produced ample evidence to establish that the EAV products have no utility apart from screening downloaded or copied data files. That is, the EAV products operate only when a user downloads or copies a file onto his computer, and the downloading or copying must happen via a downloading or copying software program. In particular, Symantec points out that the EAV product manual establishes that CA promotes its use of the EAV product in combination with a downloading program in an infringing manner. The manual states that "[t]he Realtime Monitor scans programs on a workstation or server each time a file is executed,

accessed, or opened." J.A. at 6213. In its discussion of the internet, the manual states that "[t]he newest source of infections is the Internet. . . . This feature works with browsers from Netscape and Microsoft." Id. at 6214. In response, CA maintains that Symantec has not shown any evidence of direct infringement because it has not shown that any CA customer actually performs all of the claimed method steps. Absent such a showing, CA contends that the district court properly granted summary judgment.

We find that there are genuine issues of material fact as to whether CA induced its customers to infringe the '776 patent. We agree with Symantec that CA encouraged customers to engage in direct infringement by using the EAV products in conjunction with a downloading program. This is not a case where the customers may be using the product in either an infringing way or a non-infringing way; CA's customers can only use the EAV products in an infringing way. Under these circumstances, Symantec has produced sufficient circumstantial evidence of direct infringement to create a genuine issue of material fact, even though Symantec has not produced evidence that any particular customer has directly infringed the '776 patent. Direct evidence of infringement, as opposed to circumstantial evidence, is not necessary. See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1312 (Fed. Cir. 1998) (finding that Cardinal's advertisements conceded the ability of the accused device to practice the claimed method, and encouraged such use); Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986) (rejecting the argument that "proof of inducing infringement or direct infringement requires direct, as opposed to circumstantial evidence").

We therefore vacate and remand the district court's summary judgment finding of non-infringement with respect to the EAV products.[7]   On remand, the district court should consider whether the specific intent requirement set forth in DSU, which was decided after the grant of summary judgment in this case, was met.

III

On cross-appeal, CA challenges the district court's summary judgment finding that the doctrine of laches does not bar Symantec's recovery for CA's alleged patent infringement prior to the filing of suit.   At the outset, we dismiss CA's laches claim as an improper cross-appeal.   "A party may cross-appeal if adversely affected by the appealed judgment in some particular which it seeks to have modified."  TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1156 (Fed. Cir. 2004) (internal quotation marks omitted).   A cross-appeal may only be filed "when a party seeks to enlarge its own rights under the judgment or to lessen the rights of its adversary under the judgment."  Bailey v. Dart Container Corp., 292 F.3d 1360, 1362 (Fed. Cir. 2002). Thus, a properly filed cross-appeal requires that, upon acceptance of appellee's argument, our determination would result in a reversal or modification of the judgment rather than an affirmance.  See id.  Here, the district court granted summary judgment of non-infringement on CA's EAV products.  CA argues on appeal that the doctrine of laches precludes Symantec from recovering damages on those products for any period before the filing of suit.   Thus, even if we were to agree with CA that laches precludes Symantec's recovery over the EAV products, our determination would have no effect on

---

[7]       We note that the district court appeared to confuse the test for inducement with the test for the doctrine of equivalents.  The two concepts are not related.

the district court's judgment. We therefore dismiss as improperly filed CA's laches cross-appeal.[8]

However, we may consider CA's laches arguments as an alternative ground for sustaining the judgment of non-infringement. TypeRight Keyboard, 374 F.3d at 1160 ("Even though we lack jurisdiction over the cross-appeal, [the appellee] may still defend the judgment on other grounds."). We find that the district court did not err in dismissing CA's laches defense on summary judgment.

A defendant, in order to invoke the defense of laches, must prove: "(1) [that] the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) [that] the delay operated to the prejudice or injury of the defendant." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc). A presumption of laches arises "upon proof that the patentee delayed filing suit for more than six years after actual or constructive knowledge of the defendant's alleged infringing activity." Id. at 1035-36. We review a district court's determination on the issue of laches for an abuse of discretion. Id. at 1039.

The '776 patent issued to Hilgraeve on June 7, 1994. In June 1995, an independent software company called Cheyenne Software began marketing a real-time antivirus software product called Inoculan. Hilgraeve sent a warning letter to Cheyenne dated October 5, 1996, regarding possible infringement. On November 6, 1996, CA

---

[8]     CA's other cross-appeals, directed to inequitable conduct, invalidity over the prior art, and inventorship, are proper because they would expand the scope of the judgment. In TypeRight Keyboard, we explained that "where the appellee urges invalidity as a new ground on which to support a judgment of non-infringement . . . a

acquired Cheyenne Software, and thereafter allegedly "re-branded" the Inoculan product into one of its eTrust antivirus products. Hilgraeve filed the present suit against CA on September 18, 2002, and, as discussed above, Symantec later acquired Hilgraeve's interest in the '776 patent and was substituted as the plaintiff in the present suit.

Before the district court, CA argued that Symantec should be charged with the period of delay attributable to Hilgraeve when it stepped in as the plaintiff in the present suit. CA asserted that Cheyenne's open and notorious marketing of Inoculan in June 1995 established Hilgraeve's constructive knowledge of Cheyenne's infringing use, and that, regardless, the October 5, 1996, warning letter established Hilgraeve's actual knowledge of Cheyenne's infringing use. Finally, CA argued that by establishing Hilgraeve's knowledge of Cheyenne's alleged infringement, it was also establishing Hilgraeve's knowledge with respect to the accused CA products at issue here, since CA "re-branded" the Inoculan product into one of its own.

The district court held that Hilgraeve's alleged knowledge of Inoculan, either constructive or actual, was insufficient as a matter of law to establish Hilgraeve's knowledge of the alleged infringing CA products. In doing so, it did not reach the question of whether Symantec should be charged with Hilgraeve's knowledge. Rather, it concluded that CA had failed to show evidence establishing that Inoculan was the same or similar to the products in suit. We agree that laches would only apply if the products were the same or similar, see Watkins v. Northwestern Ohio Tractor Pullers Association, Inc., 630 F.2d 1155, 1164 (6th Cir. 1980), and that CA has presented

cross-appeal is necessary since a judgment of invalidity is broader than a judgment of

insufficient evidence that Inoculan is the same or similar to any of the products in suit.[9]

On appeal, CA does not point to any such evidence but contends that Symantec's October 5, 1996, warning letter to CA, urging that it had committed willful infringement, must be interpreted as an admission that Inoculan was a precursor to one of the CA products at issue here. We cannot agree. Willful infringement requires an objective showing that the alleged actions constituted infringement of a valid patent, "determined by the record developed in the infringement proceeding." In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007). An allegation of willful infringement does not assume any similarity between Inoculan and the products in suit. We therefore find that the district court did not err in granting summary judgment to Symantec on CA's laches defense.

IV

Levin (and CA) asserts that he is an omitted co-inventor of the '776 patent.[10] To show co-inventorship, Levin is required to prove his contribution to the conception of the claims by clear and convincing evidence. See Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1461 (Fed. Cir. 1998). An alleged co-inventor's testimony, standing alone, cannot rise to the level of clear and convincing evidence; he must supply evidence to corroborate his testimony. Id. In Gemstar-TV Guide International, Inc. v. International Trade Commission, 383 F.3d 1352 (Fed. Cir. 2004), we explained that "[w]hether the

---

non-infringement." 374 F.3d at 1157 n.4.

[9] Relying on an expert's affidavit, CA asserts that the latest products at issue here utilize the same "antivirus engine technology" as that used in the original Inoculan product. This is hardly the same as demonstrating that the earlier product embodied the same claimed features as the accused product.

[10] Levin licensed any interest he may have in the '776 patent to CA.

co-inventor's testimony has been sufficiently corroborated is evaluated under a 'rule of reason analysis,' which requires that an 'evaluation of <u>all</u> pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.'" <u>Id.</u> at 1382 (quoting <u>Price v. Symsek</u>, 988 F.2d 1187, 1195 (Fed. Cir. 1993)). Corroborating evidence may be in the form of "records made contemporaneously with the inventive process," "[c]ircumstantial evidence of an independent nature," or "oral testimony from someone other than the alleged inventor." <u>Id.</u>

Before the district court, Levin submitted a declaration stating that he gave Matthew H. Gray ("Gray"), one of the named inventors of the '776 patent, the idea for the in-transit virus scan method in a February 12, 1990, telephone call. To corroborate his declaration, Levin submitted Gray's day planner, which reflected Gray's notes confirming that the disputed telephone call took place. Levin points out that Gray testified that the day planner entry that reflected his conversation with Levin was "relat[ed] to the '776 patent." J.A. at 10,064. In addition, Levin relied on the lack of evidence showing Gray's conception of the in-transit virus scan invention, which he argued further corroborated his own testimony.

The district court found that the day planner entry was insufficient as corroborating evidence. That entry, according to the district court, "at most shows only that [Levin and Gray] discussed the then-current state of the art"; it "fail[ed] to explicitly identify [Levin's] contribution." J.A. at 87-88. We agree with the district court that, at most, the day planner entry establishes that Gray and Levin spoke about the then-current state of anti-virus programs; it does not establish that Levin contributed to the idea. That entry, listing an "IBM SCAN program," a "Computer Virus Handbook," "Jim

McAffey's Virus Scan," and "Levin's Checkup Antivirus System," J.A. at 1841, suggests only that Gray simply called Levin to discuss the state of the prior art.

The district court also found that any evidence tending to call into question Gray's contribution to the invention was irrelevant to the question of whether Levin made any contribution. Again, we agree with the district court that the evidence regarding Gray's contribution was not relevant to the question of Levin's contribution. This is particularly so because Gray was not the sole inventor here; even though he may have lacked technical expertise, there is no suggestion that his co-inventors also lacked any technical expertise. This case is thus distinguishable from <u>Ethicon</u>, where we held that a <u>sole</u> inventor's lack of technical expertise corroborated another's claim of co-inventorship. 135 F.3d at 1464-65.

Levin's declaration itself is insufficient because it lacks corroboration. We therefore affirm the district court's conclusion that Levin has failed to establish a genuine issue of material fact that he was a co-inventor of the '776 patent.

V

CA appeals the district court's summary judgment determination that Hilgraeve did not commit inequitable conduct before the Patent Office in procuring the '776 patent. CA alleges that Hilgraeve made three separate false and material misrepresentations to the Patent Office: (1) Gray's April 18, 1990, declaration that he was an inventor of the '776 patent; (2) Gray's August 12, 1990, declaration to overcome prior art; and (3) co-inventor Donald Wakelin's April 18, 1990, declaration that he understood the claims of the patent application.

Patent applicants "have a duty to prosecute patent applications in the Patent Office with candor, good faith, and honesty." Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 999 (Fed. Cir. 2007). A breach of this duty constitutes inequitable conduct and renders the entire patent unenforceable. Id. In order to establish inequitable conduct, the party challenging the patent is required to establish by clear and convincing evidence that the patent applicant "(1) either made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the U.S. Patent and Trademark Office." Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1363 (Fed. Cir. 2007). "Once threshold findings of materiality and intent are established, the trial court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred." Purdue Pharma L.P. v. Endo Pharmaceuticals Inc., 438 F.3d 1123, 1128 (Fed. Cir. 2006).

Information is material when "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." eSpeed, Inc. v. BrokerTec USA, L.L.C., 480 F.3d 1129, 1136 (Fed. Cir. 2007) (quoting A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1397 (Fed. Cir. 1986)). Moreover, we have found that "[f]alse statements are more likely material when embodied in declarations or affidavits submitted to the PTO." Id.

CA's first inequitable conduct claim arises out of the April 18, 1990, declaration that Gray signed and submitted with the patent application that led to the '776 patent. In the declaration, Gray submitted that he was "an original, first and joint inventor . . . of the subject matter which is claimed and for which a patent is sought." J.A. at 1828-30.

CA asserts that Gray's declaration was a false statement because the idea for the in transit virus-detection method was Levin's. Even if Levin somehow contributed to the invention (which, as noted above, has not been established), that fact alone would not establish that Gray did not also contribute to the invention. CA also relies on Gray's inability at trial to identify with specificity the contribution that he made to the invention.

We agree with the district court that Gray's inability to identify with precision his contribution, nearly fourteen years later, does not show anything more than that Gray simply could not recall, particularly since Gray and a co-inventor, John Hile, both testified in general terms that Gray came up with the idea.[11] Finally, CA contends that Gray's lack of technical expertise establishes that Gray was not an inventor. We disagree. Gray was not the sole inventor of the claimed method. Indeed, Gray worked with the other inventors who did have technical expertise to design the invention. For these reasons, we find that the district court did not err in granting summary judgment that CA has failed to present a genuine issue of material fact that Gray was not the inventor.

CA's second inequitable conduct claim arises from an August 12, 1992, declaration submitted by Gray to the PTO in response to an office action. Gray's declaration was submitted together with a number of prior art references. In the declaration, Gray described the state of the prior art with specific reference to the attached publications and identified the "significant advantages over the existing virus

---

[11] CA appears to argue that Gray testified that the notes in the day planner described the invention, and that, since the notes summarized the Levin telephone call, the idea must have originated with Levin. Gray's testimony, however, was that the day planner entry was evidence of the date of conception, and not of the idea itself.

scanning, detecting and eliminating software" that his invention achieved. J.A. at 3866. In paragraph 1 of the declaration, Gray stated that he "ha[d] practiced in the field of computer software and, more particularly, in the area of computer communications software for 10 years . . . [and that a]s a consequence, [Gray had] become intimately familiar with the state of the art as it relates to computer viruses, computer virus detection, and computer virus prevention." Id. at 3863. CA claims that this declaration was false and misleading, because Gray was a marketing person, not a software person with technical expertise.

CA does not assert that the substance of the declaration itself was either false or misleading. The sole argument is that Gray's description of his own qualifications is misleading. The district court found that Gray's lack of technical expertise alone was insufficient to establish that his declaration was a misrepresentation. We agree. There is nothing in the record that indicates that Gray was not "intimately familiar with the state of the art," and the mere fact that he was not a technical person does nothing to refute that.[12]

CA also relies on paragraph 4 of that declaration, where Gray stated that he "set out to develop an algorithm which would determine whether a file was infected with a virus during [a] transfer and to stop the transfer before the virus was copied into the system." Id. at 3864. CA asserts that this claim was also false and misleading, since

---

[12]     When questioned as to whether "[s]itting here today, [Gray had] any knowledge concerning the state of the art in connection with computer software design and development," Gray stated: "I don't believe there's any point in time when I would have been so bold as to claim I had knowledge of the state of the art of anything." J.A. at 9993. We do not read that statement as contradicting the statement he made in the declaration concerning his earlier knowledge of virus screening technology, but rather to relate to his lack of knowledge of computer software design and development generally.

Gray later testified that he did not develop the mathematical algorithm, but rather that one of the co-inventors, Donald Wakelin, developed the algorithm. Gray's assertion that he "set out to develop an algorithm" is not the same as asserting that he actually developed the algorithm himself. Again, we see no basis for a misrepresentation claim. We conclude that CA has not established a genuine question of material fact that Gray's August 12, 1992, declaration was false or misleading.

CA's final inequitable conduct claim arises from Wakelin's April 18, 1990, declaration submitted with the original application, where he stated that he had "reviewed and underst[ood] the contents of the . . . specification, including the claims . . . ." Id. at 1828. That declaration, according to CA, was false and misleading because Wakelin allegedly did not understand the claims of the patent. Instead, Wakelin testified that he only understood the claims in general terms, that "the statements in claim one are so vague as to be practically unintelligible," id. at 10006, and that he didn't "really understand what these claims are saying." Id. at 10007. The district court found that, even if Wakelin did not fully understand the claims of the patent, that alone was not sufficient to establish a threshold level of materiality. We agree. As the district court stated, "Wakelin's failure to fully understand the language of the claim contents should not be confused for failure to understand the meaning of the claims, which would likely be considered material by a 'reasonable examiner.'" Id. at 124.

VI

Finally, we must address CA's counterclaims for invalidity. Our constructions of the terms "computer," "computer system," and "destination storage medium" require us to vacate and remand the district court's summary judgment finding that the Photonix

and the Mac prior art references did not render the claims invalid. This is because the same construction governs for validity determinations as for infringement determinations. <u>Yoon Ja Kim v. ConAgra Foods, Inc.</u>, 465 F.3d 1312, 1324 (Fed. Cir. 2006). Here, the district court distinguished the '776 patent claims over Photonix and the Mac prior art based on the conclusion that both of these antivirus programs ran on an Apple II GS computer, which itself only used peripheral devices (i.e., a floppy drive) because it did not include a hard drive.[13] The district court also concluded, with respect to the invalidity of the claims based on the Mac prior art, that "the Macintosh programs do not store the actual screened digital data after screening, but only a reference to the screened data," and therefore did not meet the claim limitation "automatically store the transferred digital data." J.A. at 184-85. The district court's decision in this respect is somewhat unclear as are the parties' briefs on this point. The district court's holding may well be intertwined with its holding that the Apple II GS computer, on which the Mac programs operated, did not have a destination storage medium. Under the circumstances, we decline to address the issue at this time. Hopefully the nature of the district court's decision will be clarified on remand.

CONCLUSION

We hold that the district court erred in its construction of the claim terms "a method of screening data as it is being transferred," "destination storage medium," "computer," and "computer system." We therefore vacate and remand as to non-infringement and invalidity. We affirm the district court's decision on laches, inequitable conduct, and inventorship.

---

[13] The district court appeared not to address claims 18-20, and on remand

The judgment of the district court is AFFIRMED-IN-PART and VACATED-IN-PART and REMANDED.

No costs.

should treat them separately.